This afternoon is case number 4-17-0860. In re the Estate of Myren. For the appellant we have Mr. Cochran. And then for the appellee we have Mr. is it Kate? That's correct. Okay. Mr. Cochran you may proceed. Good afternoon. This is not a case where we have conflicting trial testimony as to whether the testator David Myren was possessed of insane delusions. The uncontested testimony and evidence from the trial established that David Myren held these almost unspeakable beliefs with respect to his four children. It also established that there was absolutely no basis in fact to support these beliefs. And finally the evidence established that they in fact were all false. Those are all the elements required to establish insane delusion. Beyond that, since this evidence was uncontested, this is not a situation where this court needs to provide deference to a trial judge with respect to his assessment of credibility or weighing the evidence. There was no conflicting evidence to assess the different witnesses on credibility. It was uniform, unanimous, and uncontested. What was at issue was the standard to apply in evaluating petitioner's claim. Petitioners submit that this standard was well established by the Supreme Court in the American Bible case long ago. And in our, and we believe that's still the law today, and in our brief we've included a short quote from that case, which I'll just repeat here, in the Supreme Court in the American Bible. Thus conclusively, by implication, saying that if the testator was affected with a morbid or insane delusion as to one of those natural objects of his bounty, it would affect and destroy his testamentary capacity. And that's the exact situation here. Didn't he also say, which causes him to make a will he would not have made but for that delusion? Correct. It's not just the existence of the insane delusion, it's but for that delusion, that will wouldn't have been made. And I think when you have a situation where a father holds these beliefs with respect to his four children, it's inconceivable that he could make a rational, sustainable, testamentary plan with respect to those children. On the other side, the estate is making the argument that, as it may, if there's any other plausible explanation for explaining this inheritance, the will is sustained. On that, if you're in a situation, what side do you err on? If you have evidence, uncontested, that a testator is suffering under these insane delusions with respect to his very children, and on the other hand you have speculation as to this possible other cause, he might have done the same thing. Which side do you err on? I submit you err on the side of protecting the natural children of the testator. Well, how about when the trial judge has both the lawyer with substantial experience, and experience with this particular testator, and a physician, both saying he seemed to be perfectly capable of making his choices, making his decision. When he came in, he had a plan. He knew why he wanted to disinherit his children. It had nothing to do with the insane delusions. It had to do with the fact that they basically had nothing to do with him. They weren't allowing him to see his grandchildren. He commented about how his kids only came around when it was hunting time. So there are other reasonable alternatives to why he might disinherit them, weren't there? First, let me address the doctor. This was his general doctor. He treated him for things like poison ivy, erectile dysfunction, other things. He was not a psychiatrist. He admitted in his testimony... I didn't hear what you said. You said he treated him, and then you said he was not a something. A psychiatrist. Okay. And he admitted in his testimony that he didn't know, Dave Myron's wife, didn't know any of his children. So I think it's a logical conclusion that he wouldn't know about the situation with his kids and all these issues. And the other thing, with respect to the attorney, if Dave Myron held these delusions with respect to his children, which I think is established, in his mind, how could he leave anything to his children? He said, I'm going to have to disinherit them. I really believe this is true. If I do that, where can I leave this? So obviously he looks at places, other avenues that he would have an interest in. But he gave his attorney explanation for why he wanted to disinherit his children. And it wasn't the insane delusions. And his attorney made a point several times that this was a smart guy, could have been an attorney. He's sitting there meeting with his attorney. Is he going to tell him the real reason why he is disinheriting his kids? Well, he was telling everybody else, according to your witnesses, wasn't he? Right. His friends, his associates... Well, he was still a lawyer, and he had a confidence in Laura Klein. You know, let me tell you about these kids and how awful they are, these delusions. And he didn't do that. Obviously, whether he had some embarrassment or reluctance to do that, or he didn't have this reluctance... How do you speculate in place of what the trial judge was given as the evidence? The trial judge was given testimony from less than 14 witnesses that all said that he held these beliefs with respect to his children. And I think you started out pointing out that nobody contests that he had these delusions. So now we're down to but four. Are these delusions the basis of his making his decision? And that's where the judge had to also look at the other testimony that was presented. But now it sounds like you're asking us to speculate about some other possibilities as opposed to looking at the judge's record. I'm asking you to look at the evidence that was presented in this case and make your own reason, common sense conclusions as to this. You're sitting there with a father believing this about his kids. Does it make common sense to think he's going to leave them stuff, so he's going to leave it somewhere else? And he tells his attorney. He doesn't tell his attorney about all these episodes with his kids and what he believes about them. I just think when you hear this factual situation with this father, to me it defies common sense that you can conclude that he's making a rational, free decision to disinherit them and leave them to the NRA or the Health Foundation. That this never, that thought would never enter his mind if he had not been driven by these insane delusions to conclude my children are bad, I cannot leave them. So then he's gone to the next alternative. I agree if there were no question of these delusions and they might have this affection for the NRA and the Health Foundation, he'd be perfectly fine to leave his estate to them. But when you have layered in here these clearly established, the same delusions, I think it paints colors, destroys that whole free will to say that he's free to dispose of his own property. Do your clients dispute the idea that he was estranged from them? These concerns, their and Myron's concerns about how his children mistreated him? If you look at the testimony, his three sons were working with him up to the very end of his life. Continued to work with him. They weren't estranged. They worked with him on his jobs and on his farm. So it's not as if they had no contact with him. They were continuing to have that relationship. He continued to have a relationship with his grandsons through this period and after he did as well. So I don't, all that is not consistent with an estrangement there. What's our standard of review? What is our standard of review? Well, it's whether it's against the manifest weight of the evidence. And I think all the evidence supports the conclusion that he was suffering from insane delusions with respect to his children. I don't think anybody disputes that. And I think the American Bible says, end of story, if those delusions are with respect to your natural objects, your children, it destroys your testamentary capacity. There are lots of cases that deal with other types of delusions. People seeing things in trees, you know, thinking some individual is a deity and they leave them. But this is a fundamental delusion affecting the very natural objects of its bounty. And I think the Supreme Court American Bible, which hasn't changed, if those delusions affect those children, it only makes sense. You can't have a valid disposition. Because that so clouds and so blocks that testator's mind. How can you conclude that he would have done this anyway, given it to someone else? So your position is that the trial court should not have even considered whether or not he possibly would have done this anyway? Well, my alternate is, except that position that the estate is at, if there's some... When you look, and we put it in our brief, in addition to three sons, Dave Myron had a daughter. There is absolutely nothing in the record to suggest any reason other than Dave Myron's insane sexual delusions with respect to his daughter why he would have disinherited her. On that basis, when you look at Andrea Myron, I think the will fails there. If it fails to one, it fails to all. So even under the estate's position, if there's any other cause, there was no other cause suggested or proven with respect to Andrea. And the second point, with his middle son Joshua, the question is whether that mental delusion was the driving factor in his decision to disinherit him. From the very lips of Dave Myron, as he's standing in the office of his attorney to effectuate this disinheritance plan, he volunteers and comments to the attorney secretary that my son Joshua wants to have sex with me. To me, you couldn't ask for a clearer demonstration that that's his mindset. That's what's driving him to disinherit his son Josh. The same way with Andrea. If that's his motivation, which he expressed with disinheriting his son Josh, the will fails as to him and it fails as to all. So I think even under their position, when you look at those two cases, Andrea and Josh, and what the evidence showed, you have to conclude that he was disinheriting him because of those delusions, not because of any other valid reason. Even though he voiced other reasons? He never voiced any other reason with respect to Andrea. All his reasons that were reported were her sexual misconduct. He talked about problems, about the issues with the divorce and how things have been bad. Not with Andrea. It's just that children did it. That the children took the mother's side. Children took the mother's side. And that was, and the judge made a lot of testimony, that was years and years and years, over a decade before this will was signed. I think he discounted that as being relevant on the testimony capacity at the time he did this will. So any of that, and she had been dead since 2001. So the mother has been out of the picture a long time. Thank you, counsel. You will have additional time on rebuttal if you so desire. Thank you. You may proceed. Thank you. May it please the court. Counsel. I'm going to throw my notes all aside and pick up on one area that was just discussed. Whether or not Dave Byron was estranged from his children during the time period of execution of this will. He was. Let's look back at what the evidence showed. During the time period of that summer when the will was executed, his children were not speaking to him. I think we would all acknowledge, you're not getting along with your children when you're not speaking to them. What about the argument Mr. Cochran just made about they were working together? How do you work together and not speak? I think the time period in which they were working together was previous, Your Honor. I think that actually stopped at the beginning of that summer period. And it's acknowledged by, I apologize, they're all sort of jays, either Josh or Justin's wife, Antoinette, who acknowledges that none of them had been speaking to Dave during those time periods and they weren't inviting him to holidays. So I think we're all in a general period, but the period was months of execution. Now, going backwards from the time the will was executed, how long had this not speaking to them and not being invited for holidays been going on? It looks like at least that previous month or so. Previous month or so? At least the previous month or so, so that if this was done in, I believe, the July period of 2012, then you'd have at least then. And I'd argue, Your Honor, this period of not getting along with his children, the first will was admitted as well. That's not a will that speaks that you're getting along with your children. But if something happens to you physically that you want your children to cut out because you don't trust them. Well, that's the one where he says, if they didn't murder me? Correct, Your Honor. There's a lot of guns. This is clear that they're all into hunting. There are a lot of guns. There's a belief that Mr. Myron, our concern, my point simply being, that doesn't speak of a family that's getting along to have a murder clause, for gosh sake. Going beyond that. It certainly is an unusual provision. I would agree. And I fully submit that. But I would also go back, and we want to talk about estrangement with his children. Go back a couple more years. He's talking with his banker, who'd been a banker for many years, who also testified in his belief that Myron is normal, all this. And he said, I'm disinheriting my children. And the banker follows up. Well, it's too bad. Why is that? Because they're just kind of using me for hunting purposes. They just go out there on the ground, and that's the only time they really care about me. So it's a belief he's had along this way. And it's still consistent. It's consistent with what his attorney has told. And also it goes back to Mr. Cochran had this court. Don't believe that stuff. Go with the hidden reason. Go with the hidden reason that he's hiding from everyone else that's in the professionalist life to do this will. It cannot be the law. Are you disputing that he had this insane delusion about his kids? I'm disputing that it is what affected him in about four tests in terms of what created the will. That wasn't my question. I don't know. I don't know. I don't think the trial court knows. Well, we have to decide based on the evidence presented. Is there any evidence to suggest that he did not have the insane delusion Mr. Cochran argued? Your Honor, I think there was dispute as to what he was saying, when he was saying it, the context of when he was saying it. I think as we sit here, and that was for the prior fact to believe that. I'm trying to do this in a linear fashion. The first question is, did he have the insane delusion? It seems to me pretty strong evidence that he did. And the next question is, was this, as you put it, the but-for test which motivated or was behind his will? Assuming that he had those beliefs and making that assumption in this hypothetical, then it's counselor's burden, as the petitioner showed, that but-for those beliefs, that that was the cause of his will. Didn't the trial judge think that he had the insane delusions? I don't know that the trial court order states that. I mean, I don't know. I think maybe you can interpret that as saying I've taken that evidence into consideration, but I don't believe the counsel has met its burden on the but-for test of the creation of the will. I think you could make that assumption. That was going to be my question. Assuming the evidence shows the insane delusions, is it his burden to demonstrate that that underlies the will which would otherwise be okay? Yes, and I think that's American Bible. Mark and I argued about whether or not American Bible still had that test. I believe it clearly does. You could take it forward to the Hill case, which also was cited in Mr. Cochran, which also includes the but-for test. And that clearly shows that it's petitioner's burden. I know those are older cases, but I think they're still good law, and they are still Supreme Court cases. And I think that's what we're talking about here, making that assumption, but-for that. And so you look at the doctor. You look at his banker. You look at his attorney. And he has valid reasons, also about the grandchildren. I apologize for not getting, I was trying to get there, the grandchildren. He doesn't see his grandchildren during this time period. He's also not allowed to ever have them overnight. He's not allowed to ever care for them by himself. That upset him. I don't think that's unreasonable for a grandfather to think that stinks. Does his daughter have any children? I don't believe so. I cannot attest to that for a positive. I don't believe so. Because, of course, counsel argues there's no other reason for her. Well, except he did say, and this came through Mr. Hines' testimony as well, that he likes her. Now, I understand you can have good reasons to disinherit and bad reasons to disinherit. And even Andrea stated, the daughter, was she surprised that her father left her out of the will. Her response was a heartbreaking no. I know he always hated me. I understand that that's heart-wrenching in a sense. But it can be a bad-the case law is clear. You can leave your kids out for bad reasons. And also, you're not required to give your children anything. That's sad, but that's the law. Maybe there should be something that says you have to leave your children something, but that's not the law at this time. Also, when Mark says he could have left it to his grandchildren, you're right. And I point out, he could have left it to his grandchildren, too, if he'd so chosen. He loved his grandkids, and counsel would agree with that, too. And all of his children loved his grandkids. Instead, he left it to two organizations, of which he'd been a long-affirmed member of. Not just a pay-your-dues kind of member, a in-your-face, wanting-to-recruit-other-people, donate-hunts member of both the Anaheim and the Rocky Mountain Elk. So if he had wanted to leave it to family, he could have, because he loved those grandkids, and he could have left it to them. There's no dispute. Even under Judge Fagan's beliefs about the delusions, there was nothing about the grandchildren that anyone says that there was any weird thoughts even possible of that. He could have done that. He didn't. How old were the grandchildren then at the time? They ranged in age. I don't think they were over the age majority. It would have to be left to them in trust. So it would be reasonable for him to think about the fact that, well, leaving it to the grandchildren actually, in a sense, leaves it to the children, because they're going to be... Potentially involved, I suppose you could say. But I did want to point out that, as an estate planner, you can always set those up for children. It's not uncommon to set things up for grandchildren, especially when you have problems with your kids, whatever that reason might be. How much money are we talking about in this estate? It would be the acreage in Pike County. The problem with the money is the number of acres. I have to apologize for the number of acres. It's several hundred acres. I can give you the price right now, though. $2,500 per acre is accurate. At one time, Pike County got all the way up to $8,000. That was crazy. It never should have been there. This has nothing to do with the case, but there was some fraud that was going on there, which drove the price of the land up on recreational ground. It's dropped back down to the $2,500 range would be pretty accurate. If you could get $2,500 an acre right now, I think it would be good. Is there anything in the estate besides the acreage? It's really just the acreage, Your Honor. How many acres are we talking about? I apologize for trying to look back, but 320. 320? 320. 320 times 2,500 is a lot of money. It is. It for sure is. I totally understand. Go ahead. Just very briefly on the grandchildren. It's also undisputed that the other grandparents on the opposite side were allowed to, for example, have the grandchildren over, take them out to events, be by themselves, doing whatever activities that normal grandparents do. Again, I don't think it's odd or unreasonable that he had completely valid reasons to do this. Again, I go back to the burdens involved. At the trial court level, it was clearly the petitioner's burden to show that it would otherwise not have been created. At this level, it gets even worse. It has to be now against the manifest way to the evidence. The opposite conclusion is described a bunch of different ways. Or the decision was arbitrary and capricious that the opposite conclusion, based on the evidence, is clearly apparent upon the record. And basically, the trial court, I believe in quote as best as possible, Judge Segmenton telling me one time, was asleep at the wheel. Much to my detriment in that particular case. It's been a long time. It's been a while. It's stuck in my head, though, more so than probably on it. But that's the problem on appeal. And I've been on the other side of that as well. That burden of proof and then the standard of review then are difficult. And in this case, I believe that this court is required to upheld the finding of the circuit court. It's undisputed that Dave Myron knew the object of his bounty, knew what his land consisted of, his estate consisted of, and the land it consisted of. And he was able to formulate a plan in his mind. And that's what's required. Because remember, insane delusion is just a subset of mental incapacity. It isn't a separate. It's not a separate on its own cause of action. It's all under mental incapacity. That's what we're still having to show. Otherwise, defined as Mr. Cochran in the lab, it could open a floodgate. I could have a football contest and contest on any case and get it to a jury or a judge as a final find or a fact under the scenario of, if you have an insane delusion, you're stopped for all time being able to do a will. You could have good reasons. You have other thoughts. You have great reasons. You're done. You're barred. That's it. And that cannot be the law. Barring any other questions from the group? I don't see any at this time. Thank you, counsel. Thank you all. Any rebuttal, Mr. Cochran? I just feel it necessary to respond to a couple of points. First of all, one that the estate has repeatedly made, and it's really a distortion that bothers me. With respect to not letting Dave Myron see his grandkids, the only testimony or evidence in this record relates to an incident that occurred over the holidays in 2012, Thanksgiving and Christmas. This was months after he did his will. So that circumstance could hardly have had any factor in his decision to disinherit. That occurred because of him shutting off hunting during shotgun season in 2012, which is the first weekend before Thanksgiving. So that was the time the family said, we're not going to have you for the holidays when you did that. So that occurred four or five months after he did his will. So it can't possibly have factored into his decision. So I think it's really disingenuous to use that as an argument. In terms of estrangement with the family, I think the testimony is both from the Myron kids, Justin Myron. Why wouldn't that be corroborative of his position that his kids are just using him, which he had commented about, if in fact the evidence is that when he tells them they can't hunt, then they won't let him show up at the holidays? Well, the answer to that, that response was not from Justin, not from Josh, not from Joe. It was from Andrea, Justin's wife. She got upset about Dave doing that. And they're her kids, and she made that decision. So that doesn't corroborate anything with respect to the relationship, I think, between the sons and Dave. Was there any evidence that was related to Mr. Myron as to whose say it was or just that he was told he couldn't come to the holiday dinner? Anginette and Myron testified that because of that, he was disinvited for those holidays. And that's in the record. As far as the estrangement, I think the testimony is of both Justin Myron's mother-in-law and Anginette, that Dave was included in every family gathering. He was invited to all. Some of them he didn't show up to. So it was never an exclusion. He was always invited. You have to understand, Dave Myron lived in Bayless, which is over in Pike County on the river, in very questionable conditions. I mean, it's obviously understandable that a mother would be reluctant, and he's also had health problems, heart attacks, many health problems, to have her small young boys spend a night in Bayless, Illinois, with their grandfather. I think you can all understand her anxiety over that. With respect to Andrea Myron saying she's not surprised that she was cut out, of course, coming to the dead man's statue, she couldn't testify to things her father had told her in that relationship. Other people did. If she would have been free, she would have been able to say that her dad thought she was a whore, made all these accusations about her, her moral character and what she did. So obviously she wouldn't be surprised that if her father had had those feelings toward these insane delusions. But she couldn't express that. Like you said, that evidence wasn't in the record. Well, it was presented by other competent witnesses that this is what he felt about his daughter. And you can make your own inference whether that would have been communicated or some manner conveyed to her from Dave Myron. And I'm glad he brought the grandchildren because this farm is a legacy farm. It's Dave's grandfather's farm. So the Myron grandsons are the fourth generation of Myrons who enjoy this farm. Yet Dave not only disinherited his children, which he had these issues with, he also disinherited his grandkids. Which I think is a further indication that he was not in the right set of mind that he does this to his grandkids, which he has an obvious and acknowledged loving relationship. That he would take that as a rational step where he could have easily bypassed his kids and provided for his own grandkids. So I think that's a further indication why this will could not be allowed to stand. Thank you, counsel. Thank you. We'll take this matter under advisement and be in recess.